IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SHARON RUEBKE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 14-cv-1138-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Sharon Ruebke, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Disabled Widow's Benefits (DWB) pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Ruebke applied for DIB and DWB in July, 2011, alleging disability beginning on July 12, 2011.  (Tr. 12).  After holding an evidentiary hearing, ALJ Victoria A. Ferrer denied the application for benefits in a decision dated August 27, 2013.  (Tr. 12-24).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 16.

been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ mischaracterized some of the medical evidence.

2. The ALJ erred in weighing the opinion of her treating physician, Dr. Mark Preuss.

3. The Appeals Council erred in rejecting additional evidence submitted by plaintiff because the evidence was relevant and material.

## Applicable Legal Standards

To qualify for DIB a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The regulations pertaining to DWB are found at 20 C.F.R. §§ 404.335 and 404.337. The definition of disability for DIB and DWB is the same. See, 20 C.F.R. § 404.335(c), incorporating the definition of disability set forth in the DIB regulations into the DWB regulation. Most citations herein are to the DIB regulations out of convenience.

C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be

found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  See also *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Ruebke was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Ferrer followed the five-step analytical framework described above. She determined that Ms. Ruebke had not worked since the alleged onset date.  She was insured for DIB through September 30, 2016, and the prescribed period of eligibility for DWB ended on May 31, 2013.  She found that plaintiff had severe impairments of left first metacarpal arthralgia, morbid obesity, major depression, loss of vision in the left eye, degenerative joint disease of the bilateral knees and left ankle, and carpal tunnel syndrome.  She further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Ruebke had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work as a landscape laborer.  However, she was not disabled because she was able to do other jobs which exist in significant numbers in the national and regional economy.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is limited to the relevant time period.

1.  **Agency Forms**

Plaintiff was born in 1961 and was 50 years old on the alleged onset date of July 12, 2011. (Tr. 162). In September 2011, plaintiff was 5' 6" tall and weighed 240 pounds. She said she stopped working on July 12, 2011, because of her condition. She had been employed as a lawn care worker from February 1999 to July 2011. She had completed high school. (Tr. 166-168).

In October 2011, Ms. Ruebke stated in a Function Report that, on a typical day, she did some chores, watched tv, and sat outside on a porch swing. She prepared simple food such as sandwiches or toast. She needed help with house and yard work. She was not interested in much since her husband had passed away. She alleged difficulty with activities such as lifting, bending, walking, sitting and using her hands. (Tr. 180-187).

In a subsequent report, she stated that, as of about March 2012, she had increased pain in her legs and knees, and pain in her left arm was going into her fingers. Her depression was worse and she worried "all the time." (Tr. 226).

2.  **Evidentiary Hearing**

Ms. Ruebke was represented by an attorney at the evidentiary hearing on

July 12, 2013.  (Tr. 39).

Ms. Ruebke lived with her 24 year old son, who was employed.  Her son cooked and did the vacuuming.  (Tr. 48-49).  Plaintiff sometimes babysat her 4 year old grandson.  He weighed about 45 pounds.  She had not been able to pick him up for the past 6 months because of pain in her knees and back.  (Tr. 50-51).

Plaintiff testified that she stopped working because of leg pain and carpal tunnel pain, along with headaches and her weight.  Also, her depression and blood pressure were getting worse.  She wore a brace on her left wrist at night because of carpal tunnel.  She had not had surgery because she had no insurance and could not afford it.  She had headaches two or three times a day.  She had pain in her knees because of arthritis and a torn meniscus in the right knee.  She took Tramadol for pain and Tylenol for headaches.  (Tr. 41-44).

Her depression had gotten worse since her husband passed away in 2006.  She took Fluoxetine (Prozac) for depression, which helped most of the time.  (Tr. 45-46).

Ms. Ruebke testified that it took her longer to do things because of her leg pain.  She had difficulty using her left hand, which was her dominant hand.  She had numbness and pain in her left hand and fingers.  (Tr. 55-57).

A vocational expert (VE) also testified.  The ALJ asked him several hypothetical questions.  One of the question corresponded to the ultimate RFC findings, that is, a person who could do work at the light exertional level, limited to only 30 minutes of continuous standing and walking; only occasional climbing of

ramps and stairs; no climbing of ladders, ropes or scaffolds; frequent handling and fingering with the dominant left upper extremity; only occasionally using vision for depth perception; no work at unprotected heights or with hazardous machinery; no pushing or pulling with the lower level extremities; no pivoting or turning with the knees; only simple, routine, repetitive tasks and simple instructions; and no fast-paced, high production demands.

The VE testified that this person could not do plaintiff's past work, but could do other jobs such as housekeeper and hand packer. (Tr. 62-65).

### 3.   Relevant Medical Treatment

In January 2008, plaintiff complained of left knee pain and swelling. An MRI of the left knee in January 2008 showed a tear of the medial meniscus. (Tr. 328). In April, 2008, an x-ray of the left ankle showed mild spurring along the Achilles and plantar surfaces. (Tr. 263). In June, 2011, an x-ray of the left wrist was negative. (Tr. 251).

Ms. Ruebke's primary care physician was Dr. Mark Preuss. She was usually seen by physician's assistant Karen Chamness, who worked in that office. The earliest office note is dated October 20, 2007. Before the alleged date of onset (July 12, 2011), PA Chamness saw plaintiff for weight management, pain in both knees, depression, anxiety, left ankle pain, low back pain, hypertension and persistent cough. (Tr. 285-304).

On June 6, 2011, PA Chamness noted that plaintiff was taking Vicodin for chronic ankle pain. (Tr. 286). On June 23, 2011, she noted that plaintiff had

been taking Vimovo samples for arthritis pain in her hands and knees.[3] They discussed the possibility of an orthopedic referral for her wrist, but plaintiff wanted to hold off on that. (Tr. 285).

On July 18, 2011, PA Chamness saw her for follow-up of weight-loss medication. She was taking Adipex and was feeling well.[4] She stated that she had quit her job because "she was unable to tolerate the heat." She complained of arm pain and chronic pain in her ankle. She said that she was going to be applying for disability. She had symptoms of depression and wanted to go back on Fluoxetine, which had helped her in the past. On exam, she was in no acute distress. Her heart rate was regular, her lungs were clear, and her lower extremities did not have any edema. The assessment was weight management and depression. (Tr. 284).

PA Chamness performed a "disability physical" on August 15, 2011. She noted that plaintiff was applying for disability "because she is legally blind in one eye, she has had chronic knee and ankle pain, and she has had a long history of depression and arthritis as well as hypertension." No abnormalities were noted on physical exam, but PA Chamness prescribed Vicodin and refilled her other medications, including Fluoxetine. She also filled out a "disability form." (Tr. 398).

PA Chamness saw plaintiff six times between October 28, 2011, and July 2,

---

[3] Vimovo is a combination of esomeprazole and naproxen. It is a nonsteroidal anti-inflammatory drug. See, http://www.drugs.com/vimovo.html, visited on December 10, 2015.
[4] Adipex is a "stimulant similar to an amphetamine." It acts as an appetite suppressant. See, http://www.drugs.com/adipex.html, visited on December 10, 2015.

2012. Some of these visits were for weight loss management, urinary tract infection and abdominal pain. Complaints of left wrist pain and bilateral knee pain and edema were noted. PA Chamness did not document any objective abnormalities on physical exam with respect to plaintiff's wrist or knees. (Tr. 392-397).

The next visit was on January 31, 2013. Plaintiff complained of a painful "knot" on her abdomen. Her husband had died of colon cancer, and she was concerned about that possibility. PA Chamness recommended a CT scan of the abdomen and a colonoscopy, but Ms. Ruebke did not have health insurance and was unable to pay for these procedures. (Tr. 406).

PA Chamness saw plaintiff on April 3, 2013, for a review of her medications. She reported "increased arthritis pain in her neck." She also complained of "myalgias" in her legs, pain in her knees, and low back and cervical spine pain without radiation. She denied headaches. No abnormal findings were noted on physical exam. PA Chamness recommended that she add Tylenol Arthritis because Vimovo was not controlling her pain. (Tr. 404-405).

On June 12, 2013, PA Chamness noted that they "finally were able to obtain an MRI" of plaintiff's right knee, which showed a "fairly complex tear of her meniscus." The MRI report is at Tr. 407-408. On exam, she had mild pain on both varus and valgus stress. PA Chamness recommended that she apply ice three times a day and continue to take Vimovo. She noted that plaintiff had a brace at home which she would use until an orthopedic referral could be made and a repair

undertaken. She also recommended that plaintiff should not push anything with her feet and should avoid pivoting or turning. With regard to plaintiff's depression, she noted that Fluoxetine was working well, and plaintiff reported that she had no crying spells or mood swings, and was sleeping well. (Tr. 402).

4. **Consultative Examinations**

Dr. Raymond Leung performed a physical examination at the request of the agency in November 2011. He found that plaintiff walked with a slight limp. She was able to walk 50 feet unassisted. She was able to tandem walk, heel walk and toe walk, but could not hop and could squat only ¼ of the way. She had crepitus in her knees. She had no muscle atrophy or spasms. She had a full range of motion of the cervical and lumbar spines. She could not extend her left fingers all the way, and had difficulty picking up a penny with her left hand. She had decreased sensation to light touch and pin prick in the left hand. Phalen's test (a test for carpal tunnel syndrome) was positive on the left side. The assessment was arthritis in the left hand, left knee and left ankle, bilateral carpal tunnel syndrome, left eye blindness, high blood pressure and morbid obesity. (Tr. 345-351).

Stephen G. Vincent, Ph.D., performed a consultative psychological exam in November 2011. Plaintiff told him she had financial problems and was unable to afford medical treatment. She had been diagnosed with depression in the past. He noted no postural or gait disturbances. He noted that she appeared physically uncomfortable during the exam. She had taken Prozac in the past, but was not taking any prescription medication for depression at the time of the exam. The

Axis I diagnosis was major depression.  (Tr. 340-343).

### 5.   Opinions of Treating Sources

In June 2013, PA Chamness indicated in an office note that Ms. Ruebke should apply ice to her right knee three times a day and should continue to take Vimovo.  She should wear a brace on her knee and should limit climbing, should not push anything with her feet, and should avoid pivoting or turning.  (Tr. 402).

In June 2012, Dr. Preuss completed a form entitled "Arthritis Residual Functional Capacity Questionnaire."  Among other limitations, he indicated that Ms. Ruebke could stand/walk for less than two hours total a day and could sit for less than two hours total day.  He also indicated that, with "prolonged sitting," she should elevate her legs to waist height.  (Tr. 385-391).

### 6.   Records not before the ALJ

The transcript contains medical records that were not before the ALJ.  As of the time the ALJ issued her decision, the medical records consisted of Exhibits 1F through 12F, i.e., Tr. 251 through 412.  See, List of Exhibits attached to ALJ's decision, Tr. 28-29.  Plaintiff submitted the additional records to the Appeals Council in connection with her request for review.  See, AC Exhibits List, Tr. 5. Thus, the medical records at Tr. 413-416, designated by the Appeals Council as Exhibit 13F, were not before the ALJ and cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a

part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994). See also, *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

## Analysis

The Court turns first to plaintiff's third point regarding the records she submitted to the Appeals Council. The records consist of radiology reports of lumbar and hip X-rays dated May 14, 2014, and a statement signed by PA Chamness and Dr. Preuss in support of plaintiff's application for a disabled parking permit. She argues that the records were relevant and material. Defendant argues that the records are not relevant because they do not relate to the relevant time period.

With respect to Appeals Council review, 20 C.F.R. §404.970(b) provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

The decision of the Appeals Council denying review, as opposed to an order refusing to consider additional evidence, is within the discretion of the Appeals Council. It is not the final decision of the Commissioner, and is not subject to judicial review. 42 U.S.C. § 405(g); *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th

Cir. 1997). However, the Court may consider the issue of whether an Appeals Council order refusing to consider additional evidence was the result of a mistake of law. *Farrell v. Astrue*, 692 F.3d 767, 770-771 (7th Cir. 2012); *Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993). The Seventh Circuit has explained when judicial review is available as follows:

> Our ability to review the Appeals Council's decision in the instant case is dependent on the grounds on which the Council declined to grant plenary review. If the Council determined [plaintiff's] newly submitted evidence was, for whatever reason, not new and material, and therefore deemed the evidence "non-qualifying under the regulation," we retain jurisdiction to review that conclusion for legal error. [internal citations omitted]. However, if the Appeals Council deemed the evidence new, material, and time-relevant but denied plenary review of the ALJ's decision based on its conclusion that the record—as supplemented—does not demonstrate that the ALJ's decision was "contrary to the weight of the evidence"—the Council's decision not to engage in plenary review is "discretionary and unreviewable." *Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir.1997).

*Stepp v. Colvin*, 795 F.3d 711, 722 (7th Cir. 2015).

Here, the Appeals Council did not specify whether or not it accepted the evidence as "new, material and time-relevant." The notice denying review stated only that it considered the additional evidence and "We found that this information does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 1-2). The Seventh Circuit has held that, without more explanation, this "standard boilerplate language" indicates that the Appeals Council rejected the new evidence as "non-qualifying under the regulation." *Stepp*, 795 F.3d at 723, citing

*Farrell,* 692 F.3d at 771.

Defendant does not argue that the Appeals Council accepted the new evidence and rendered a discretionary denial of review so as to preclude consideration by this Court of the Appeals Council action. Rather, she argues that the evidence submitted to the Appeals Council was not qualifying under the regulation because it did not relate to the time period in issue. See, Doc. 35, p. 14.

The ALJ's decision was dated August 27, 2013. The evidence submitted to the Appeals Council (radiology reports of x-rays the lumbar spine and left hip and doctor's statement in support of application for disabled parking permit) was dated May 14, 2014. (Tr. 414-416). The spine x-rays showed "multilevel degenerative spondylosis includes moderately advanced disc disease at L2-3 and facet arthrosis at the lower three lumbar levels." The hip x-rays showed "mild degenerative arthritis."

The Court finds that the May 14, 2014, x-rays relate to the period before the date of the ALJ's decision. The x-rays do not indicate that plaintiff suffered a traumatic injury that occurred after the ALJ's decision. Rather, they show degenerative changes. "Degenerative" implies "a condition that will get worse over time." *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013). The medical records reflect that Ms. Ruebke complained of back pain to PA Chamness during the relevant period (Tr. 404-405), and she testified that she had back pain (Tr. 50-51). There were no lumbar spine or hip x-rays taken before the ALJ's decision. The x-rays submitted to the Appeals Council were taken only nine months after the

ALJ's decision.  In view of the degenerative nature of plaintiff's back condition, the x-rays arguably document conditions that were first manifested before the ALJ's decision.  See, *Farrell v Astrue*, 692 F.3d 767, 771 (7th Cir. 2012), holding that a diagnosis of fibromylagia made after the ALJ's decision was material where it confirmed allusions to fibromylagia present in earlier records.

Of course, the Appeals Council did not explain why, or even whether, it rejected the new evidence.  While the Appeals Council is not legally required to do so, the Seventh Circuit has suggested that "in all fairness to the party appealing the ALJ's decision, the Appeals Council should articulate its reasoning."  *Stepp*, 795 F.3d at 725, n. 7, citing *Damato v. Sullivan*, 945 F.2d 982, 989, n. 6 (7th Cir.1991).  The Commissioner defends the decision on the basis that the evidence did not relate to the relevant time period.  In the absence of an explanation by the Appeals Council, the Court sees no reason to consider whether the evidence could be considered non-qualifying for any other reason.

Plaintiff's other two points are not meritorious and can be swiftly disposed of.

Plaintiff argues that the ALJ mischaracterized the medical evidence by stating that "the medical records do not show any worsening of the claimant's impairments at or near the alleged onset date."  (Tr. 18).  Plaintiff is incorrect.

Plaintiff concedes that she sought treatment for her allegedly disabling impairments before the alleged onset date, while she was still working.  See, Doc. 26, p. 6.  The alleged onset date is July 12, 2011.  Ms. Ruebke does not claim that anything happened on that date, such as an accident or injury, to cause her to stop

working.  On June 6, 2011, PA Chamness noted that plaintiff was taking Vicodin for chronic ankle pain.  (Tr. 286).  On June 23, 2011, she noted that plaintiff had been taking Vimovo samples for arthritis pain in her hands and knees.  (Tr. 285). On July 18, 2011, plaintiff told PA Chamness that she had quit her job because "she was unable to tolerate the heat."  She complained of arm pain and chronic pain in her ankle, as well as symptoms of depression.  (Tr. 284).  The next visit was on August 15, 2011, when plaintiff saw PA Chamness for a "disability physical." She noted that plaintiff was applying for disability "because she is legally blind in one eye, she has had chronic knee and ankle pain, and she has had a long history of depression and arthritis as well as hypertension."  (Tr. 398).  These records support the ALJ's observation.

Lastly, plaintiff argues that the ALJ erred in not giving more weight to the opinion of Dr. Preuss.  She takes issue with the ALJ's conclusion that Dr. Preuss' opinion was not supported by the medical records or the findings of the consultative exam, and was inconsistent with PA Chamness' opinion.

"[W]hile the treating physician's opinion is important, it is not the final word on a claimant's disability."  *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted).  If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in 20 C.F.R. §404.1527.  Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, 20 C.F.R. §404.1527(c).  In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions

are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

The ALJ gave specific reasons for rejecting Dr. Preuss' opinion: his "extreme" limitations on walking, standing or sitting were not supported by the medical records or by Dr. Leung's examination; there was no support in the medical records for his opinion that plaintiff must elevate her legs; his opinion was inconsistent with PA Chamness' opinion; and plaintiff testified that Dr. Preuss did not examine her in 2013 and she could not remember the last time Dr. Preuss examined her. (Tr. 22).

Plaintiff's argument fails to recognize the fact that the medical records do not indicate that Dr. Preuss saw plaintiff at all during the relevant period. Arguably, he

should not even be considered a treating physician.

Plaintiff points to no evidence in the record to support Dr. Preuss' opinion that she must elevate her legs, or to support his opinion regarding her ability to sit and stand.  She argues that her knee and ankle pain and her torn menisci support his opinion regarding walking limitations, but, as the ALJ noted, that opinion is inconsistent with the opinion of PA Chamness, who saw her on a regular basis.  On this last point, plaintiff argues that PA Chamness' opinion was limited to the torn right meniscus, and did not encompass all of her limitations.  That may be true of the note dated June 12, 2013, but the argument ignores the fact that, although she saw plaintiff on a number of visits, PA Chamness never indicated that plaintiff had limitations in sitting, standing or walking, and she never recommended that plaintiff elevate her legs while seated.  Plaintiff points out that PA Chamness signed a statement in support of plaintiff's application for a disabled parking permit, but this document was not before the ALJ and cannot be considered here.  In short, ALJ Ferrer easily met and exceeded the "minimal articulation" standard.

This Court concludes that the ALJ's decision was supported by substantial evidence.  However, the Appeals Council erred as a matter of law in rejecting plaintiff's new evidence.  In view of the Appeals Council's error, remand pursuant to sentence four of Section 405(g) is warranted.  See, *Stepp*, 795 F.3d at 726, n. 8, explaining that a sentence six remand is not appropriate in these circumstances.

## Conclusion

The Commissioner's final decision denying Sharon Ruebke's application for


social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATE:   **December 11, 2015.**

> **s/ Clifford J. Proud**
> **CLIFFORD J. PROUD**
> **UNITED STATES MAGISTRATE JUDGE**